# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **PENN VIRGINIA OIL & GAS CORPORATION,** | ) ) | |
| Petitioner, | ) ) | Civil Action No.: 1:06cv00090 |
| v. | ) ) ) | **REPORT AND RECOMMENDATION** |
| **CNX GAS COMPANY, LLC,** | ) | By: Pamela Meade Sargent |
| Respondent. | ) | United States Magistrate Judge |

      This case comes before the court on request for review of a prior arbitration proceeding between the respective parties. Petitioner, Penn Virginia Oil & Gas Corporation, ("Penn Virginia"), is a Virginia corporation with its principal place of business in Tennessee. Respondent, CNX Gas Company, LLC, ("CNX"), is a limited liability company, whose sole member is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Pennsylvania. The court has subject matter jurisdiction under 28 U.S.C. §1332 because the citizenship of the parties is diverse and the amount in controversy, exclusive of interest and costs, exceeds $75,000. Penn Virginia filed an application with the court seeking the confirmation of an arbitration award, (Docket Item No. 1), ("Complaint"). Thereafter, CNX filed a motion to vacate the arbitration award, (Docket Item No. 7), ("Motion to Vacate"), which is currently before the court. The Motion to Vacate is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). A hearing was held on the Motion on November 30, 2006. As directed by the order of referral, the undersigned now submits the following report and

recommended disposition.

## *I. Facts*

The facts concerning the background of this matter are set forth in the arbitration decision attached as an exhibit to Penn Virginia's Complaint. On November 3, 1997, predecessors-in-interest to the parties in this case entered into a lease agreement, ("the Lease"), (Exhibit 3 to Complaint), for the drilling and development of coal bed methane wells on more than 10,000 acres in Tazewell and Buchanan Counties in Virginia. Penn Virginia acquired its interest as a lessor in 2000 or 2001. CNX is the lessee, having acquired its interest from Pocahontas Gas Partnership. The Lease specified an initial term of five years, ("Primary Term"), with the right of the lessee to extend its rights under the Lease under certain circumstances that were expressly set forth in the Lease.

On August 13, 2004, Penn Virginia notified CNX in writing that the Lease had been terminated by its own terms as of December 31, 2002, because of CNX's failure as lessee to drill a minimum of 110 wells on the property by the end of the Primary Term. By letter dated March 11, 2005, CNX responded, rejecting Penn Virginia's assertion that it was required by the terms of the Lease to drill a minimum of 110 wells on the property during the Primary Term and, instead, maintaining that, by the payment of minimum annual rentals during the Primary Term, the Lease remained in full force and effect.

By letter dated July 20, 2005, Penn Virginia notified CNX to commence

arbitration under the terms and conditions set forth in the Lease. Thereafter, each of the parties named an arbitrator. In turn, those arbitrators selected an umpire-arbitrator. The matter came to be heard before the three arbitrators, ("the Panel"), on July 19, 2006, at which time each side presented evidence. Pre-hearing and post-hearing briefs were submitted by the parties in accordance with a schedule set by the Panel.

The Lease set forth the terms and conditions under which the lessee had the right to drill for and produce coal bed methane gas on the leased premises. Specifically, the Lease granted to CNX as successor lessee the "sole and exclusive right and privilege of conducting geological, geophysical and other exploratory work for coal bed methane gas and operating wells for producing and marketing" the same. Article SECOND(a) contained a drilling schedule in which the lessee agreed to "commence, or cause to be commenced, the drilling of" wells in annual increments totaling 110 wells from the effective date of the Lease through December 31, 2002. In return for obtaining the exclusive right to produce and sell the coal bed methane gas, CNX had a duty to "diligently exercise those rights" and to "diligently proceed with the development of the Premises for the production of coal bed methane . . . as a reasonably prudent operator would under the circumstances" and to "diligently prosecute the drilling and completion of [those wells] in paying quantities or plugging and abandoning" those wells.

The lessor excepted and reserved numerous rights from those granted to lessee, including surface rights where the lessor owned mineral rights only, rights-of-way of the Norfolk and Western Railway Company, coal deposits and coal mining rights to which the rights of the lessee were subordinate and any other rights not expressly

granted to lessee. The Lease contained no warranty of title.

According to Article FIRST of the Lease, the term of the Lease was for a period of five years, ("Primary Term"), and for as long thereafter as coal bed methane was produced. Article SECOND provided that "subject to the terms of Article THIRD (c), in the event Lessee shall fail or refuse to so commence such well and diligently prosecute the drilling thereof . . . this Lease and all of Lessee's rights thereunder shall terminate without further notice to Lessee, and Lessee shall surrender the same . . ." Article THIRD (c) provided that "[t]he payment by Lessee of minimum annual rental for any Lease year during the Primary Term . . . shall operate as a rental and cover the privilege for Lessee of deferring the commencement or diligent prosecution of drilling operations during the lease year as might otherwise be required under the terms of the Lease."

The parties stipulated at the arbitration hearing that a total of 72 wells had been drilled and produced on the leased premises since the inception of the Lease. Of those 72 wells, several were drilled off the premises, but in areas where the leased premises were pooled to form the drilling unit. The parties further stipulated that approximately 4,500 acres of the leased premises remained undeveloped. During the Primary Term, CNX paid annual minimum rentals to Penn Virginia on the entire 10,000 acres.

CNX responded to Penn Virginia's August 13, 2004, notice of termination by letter dated March 11, 2005, in which it maintained that the Lease remained in full force and effect because its payment of annual minimum rentals relieved it from its commitment to drill 110 wells during the Primary Term. Scott Hodges, an employee

of CNX, testified at the arbitration hearing that, at a meeting of the Eastern Mineral Law Foundation in Lexington, Kentucky, in October 2003, he had a conversation with Jim McKinney of Penn Virginia, and that McKinney told him that Penn Virginia considered the Lease to be in effect as of that date. Hodges further testified that he told McKinney that CNX was unable to complete its minimum drilling commitment during the Primary Term of the Lease because of events beyond its control. However, McKinney denied telling Hodges that Penn Virginia considered the Lease to be in full force and effect, and he testified at the arbitration hearing that he had no recollection of Hodges telling him of the reasons CNX had not met its drilling obligations. McKinney further testified that Penn Virginia did not notify CNX of the termination of the Lease until August 2004 because it was waiting on the completion of a royalty audit of CNX's operations.

In its pre-hearing and post-hearing briefs and at the arbitration hearing, CNX maintained that its failure to comply with the minimum drilling commitment was caused by events of *force majeure* and, therefore, its obligations were suspended under Article THIRTIETH of the Lease. The first paragraph of Article THIRTIETH provides:

> In the event Lessee is rendered unable, in whole or in part, by a force majeure to carry out any of its obligations under this agreement, such obligations shall be suspended during the continuance of any inability so caused. The term "Force Majeure" as employed herein shall be acts of God, strikes, lockouts, or other industrial disturbance, acts of the public enemy, wars, blockades, riots, epidemics, lightning, earthquakes, explosions, accidents, or repairs to machinery or pipes, delays of carriers, inability to obtain materials or right-of-way on reasonable terms, acts of public authorities, or causes not within the control of Lessee and which

-5-

Case 1:06-cv-00090-GMW-PMS   Document 20   Filed 02/22/07   Page 5 of 17   Pageid#: 227

by the exercise of due diligence Lessee is unable to overcome.

At the arbitration hearing, witnesses for CNX testified that despite efforts to drill the wells in accordance with the drilling schedule set forth in the Lease, they were unable to do so. According to their testimony, the following events prevented CNX from drilling the 110 wells as provided for in Article SECOND of the Lease:

1. During the course of conducting a title examination of the leased premises, CNX discovered that a portion contained surface and mineral rights that were adverse to the lessor;

2. CNX received written objections from Anker Mining[1] stating that CNX's drilling operations would interfere with Anker's mining plans;

3. CNX discovered that Norfolk and Western Railway Company had a rail line that ran north/south throughout the entire leased premises and also owned fee and surface properties on each side of the rail line;

4. There were residential subdivisions in the communities of Jewell Ridge and Stinson's Ridge on the surface above some of the leased premises;

5. The Virginia Oil and Gas Board would not permit the drilling of infill wells on the property until several years elapsed following the execution of the Lease; and

6. Jewell Ridge Coal Corporations had begun mining in a coal seam on the leased premises after the execution of the coal bed methane Lease and objected to CNX's drilling through that coal seam.

CNX employees testified at the arbitration hearing that they spent countless hours working on these and other matters relating to the drilling of wells on the

---

[1] Anker Virginia Mining, Inc., is one of the original Lessors named in the Lease.

-6-

property. In fact, Hodges testified that for several years, he spent 100% of his time on this project. Hodges did admit that CNX did not begin its title examination or other due diligence review of the leased premises until after the Lease was executed.

The Lease provided that any dispute arising between the parties in relation to the Lease would be referred to a panel of arbitrators. The Lease provided a method for choosing the panel of arbitrators, but it did not specifically provide any right of appeal or any time limit for the filing of an appeal.

On August 13, 2004, Penn Virginia notified CNX of its intent to declare the Lease terminated. By letter dated July 20, 2005, Penn Virginia notified CNX to commence arbitration under the terms and conditions set forth in the Lease. Specifically, Penn Virginia stated that it wished to submit for arbitration the issue of whether the Lease had terminated under Article SECOND due to CNX's failure to commence and diligently prosecute the drilling of the number of wells required in Article SECOND, therefore entitling Penn Virginia to the return of undeveloped acreage. (Exhibit 1 to Docket Item No. 2). The arbitration hearing was held before the Panel on July 19, 2006. The Panel's majority opinion stated that the sole issue before it was "whether, as Penn Virginia argues, the lease is terminated in accordance with its terms." (Exhibit 6 to Complaint, ("Award"), at 4.) The Panel further stated that it was Penn Virginia's position that the Lease had terminated due to CNX's failure to drill the minimum number of wells required by the Lease, and that CNX's failure to do so had not been excused or suspended by events of *force majeure*. (Award at 4.) The Panel noted that it was CNX's position that the payment of annual minimum rentals to Penn Virginia during the Primary Term of the Lease extended the Primary Term, and that if it did have such an obligation to drill the 110 wells and

failed to do so, such failure had been suspended due to events of *force majeure*. (Award at 4.)

At the arbitration proceeding, CNX argued that the Lease had not terminated for the following four reasons: (1) by its express terms, the Lease termination provision is not triggered unless CNX failed *both* to meet any drilling schedule set forth in the Lease and to exercise due diligence in its operations; (2) by its express terms, the *force majeure* clause in the Lease suspended CNX's drilling obligation during the Primary Term; (3) the inability to gain critical right-of-way access to all undrilled portions of the leasehold estate rendered CNX's performance under the Lease impossible; and (4) Penn Virginia waived its right to seek termination of the Lease by continuing to do business with CNX for years following the natural expiration of the Primary Term, in a manner wholly consistent with the terms of the Lease and the parties' ongoing commercial relationship. Conversely, Penn Virginia argued that the Lease required CNX to actually drill and complete 110 wells during the Primary Term, and that this requirement could not be suspended or mitigated under the Lease by reason of *force majeure* events or CNX's prudent and diligent development of the leasehold estate.

Following the arbitration, the parties were asked to submit post-arbitration briefs and to specifically address the critical issue of "*force majeure* and such related issues as foreseeability." Following the submission of these post-arbitration briefs, the Panel rendered a decision in Penn Virginia's favor on August 21, 2006, and August 28, 2006.

On September 8, 2006, Penn Virginia filed its application with this court

seeking to confirm the arbitration award. (Docket Item No. 1). CNX filed its answer on October 16, 2006. (Docket Item No. 6). The same day, CNX filed the Motion to Vacate that is currently before the court. (Docket Item No. 7).

*II. Analysis*

There is some dispute among the parties as to what the applicable law is in this case. Penn Virginia alleges that the Virginia Uniform Arbitration Act, ("VUAA"), VA. CODE ANN. § 8.01-581.01 *et seq.*, is controlling. Conversely, CNX alleges that the Federal Arbitration Act, ("FAA"), 9 U.S.C. § 2 *et seq.*, applies. I note that the Lease does not expressly provide which law was to be applied in the event of arbitration. Despite CNX's allegation in its brief that prior to arbitration the parties raised the issue of which arbitration act would apply given the absence of an express directive in the Lease and that counsel agreed and stipulated that federal law was applicable generally because the case and any dispute regarding arbitrability would have been brought in federal court on diversity grounds, Penn Virginia denies such allegation. The Fourth Circuit has clearly held that, in determining whether a right to arbitrate exists, federal law will preempt state law if the contract underlying a potentially arbitrable dispute evidences a transaction involving interstate commerce. *See Maxum Founds., Inc. v. Salus Corp.*, 779 F.2d 974, 978 (4th Cir. 1985); *see also In re Mercury Constr. Corp.*, 656 F.2d 933, 938 (4th Cir. 1981) (en banc), *aff'd sub. nom. Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983). Specifically, in order for the FAA to apply, two findings must be made: (1) that there was an agreement in writing providing for arbitration and (2) that the contract evidences a transaction involving interstate commerce. *See Am. Home Assurance Co. v. Vecco Concrete Constr. Co., Inc. of Va.*, 629 F.2d 961, 963 (4th Cir. 1980) (citing

-9-

*Bernhardt v. Polygraphic Co.*, 350 U.S. 198 (1956)). Here, it is not disputed that the Lease is in writing. Furthermore, it is apparent that the Lease evidences a transaction involving interstate commerce. As successors-in-interest to the original parties to the Lease, Penn Virginia, a Virginia corporation with its principal place of business in Tennessee agreed with CNX, an LLC whose sole member is a corporation organized and existing under the laws of the State of Delaware and with its principal place of business in Pennsylvania, to drill and develop coal bed methane wells on property located in Virginia. Thus, the FAA governs whether the right to arbitrate exists. However, that is not the issue currently before the court, as the case already has been arbitrated. The issue that this court must decide is whether the VUAA or the FAA applies in determining whether the arbitration award should be vacated.

The United States Supreme Court has held that the FAA contains no express preemptive provision and does not reflect a Congressional intent to occupy the entire field of arbitration. *See Volt Info. Sciences, Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 477 (1989) (citing *Bernhardt*, 350 U.S. at 198). However, even when Congress has not completely displaced state regulation in an area, state law may be preempted to the extent that it conflicts with federal law, meaning to the extent that it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Volt Info. Sciences, Inc.*, 489 U.S. at 477 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). The FAA was designed "to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate," *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219-20 (1985), and to place such agreements "'upon the same footing as other contracts.'" *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974) (quoting H.R. Rep. No. 96, 68th Cong., 1st Sess., 1,2 (1924)). As the

-10-

Court noted in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967), the FAA was designed "to make arbitration agreements as enforceable as other contracts, but not more so." However, the Court in *Volt Info. Sciences, Inc.* further noted that there is no federal policy favoring arbitration under a certain set of procedural rules. Instead, it held that the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate. *See Volt Info. Sciences, Inc.*, 489 U.S. at 476. As previously stated, that already has been accomplished. The parties' agreement to arbitrate was enforced. Now the question that this court must answer is whether that award must be vacated.

While there is no case law in this circuit, other courts have held that FAA standards of review cannot preempt state law standards of review for arbitration awards unless the state law standards of review frustrate the underlying objectives of the FAA because standards of review are an inherently procedural mechanism used to facilitate judicial resolution of controversies after the underlying arbitration agreement already has been enforced in accordance with the FAA. *See Trombetta v. Raymond James Fin. Servs., Inc.*, 907 A.2d 550, 568 (Pa. Super. Ct. 2006); *see also M & L Power Servs., Inc. v. Am. Networks Int'l*, 44 F. Supp. 2d 134, 141 (D. R.I. 1999) (holding that the FAA does not preempt state law that does not limit a party's ability to enforce an arbitration award); *Siegel v. Prudential Ins. Co. of Am.*, 79 Cal. Rptr. 2d 726, 735 (Cal. Ct. App. 1998) (holding that California's rule against on the merits review furthers rather than defeats full effectuation of the federal law's policies); *Flexible Mfg. Sys. Pty Ltd. v. Super Prods. Corp.*, 874 F. Supp. 247, 249 (E.D. Wis. 1994) (holding that as long as the Wisconsin act protects the parties' choice of resolution of their disputes through arbitration, it will not conflict with the

FAA and will not be preempted thereby).  Thus, in deciding whether the FAA or the VUAA applies to the review of the arbitration award, the court must decide whether the specific provision of the VUAA at issue here conflicts with the policies underlying the FAA.  To do so, I must find that the "state law provides lesser protection for arbitration agreements and awards than does federal law." *M & L Power Servs., Inc.*, 44 F. Supp. 2d at 141.  For the following reasons, I find that it does not.

The section of the VUAA relevant to vacation of an arbitration award states, in part, as follows:

> Upon application of a party, the court shall vacate an award where:
> 1. The award was procured by corruption, fraud or other undue means;
> 2. There was evident partiality by an arbitrator appointed as a neutral, corruption in any of the arbitrators, or misconduct prejudicing the rights of any party;
> 3. The arbitrators exceeded their powers;
> 4. The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of § 8.01-581.04, in such a way as to substantially prejudice the rights of a party; or
> 5. There was no arbitration agreement and the issue was not adversely determined in proceedings under § 8.01-581.02 and the party did not participate in the arbitration hearing without raising the objection. ...

VA. CODE ANN. § 8.01-581.010 (2000).

The FAA, by contrast, allows a court to vacate an arbitration award:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or

-12-

either of them;
(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C.A. § 10(a) (West 1999 & Supp. 2006). In addition to these statutory grounds for vacating an arbitration award under the FAA, the Fourth Circuit has held that an arbitration award also may be vacated upon a showing of certain limited common law grounds, including that the award fails to draw its essence from the contract or that the award evidences a manifest disregard of the law. *See Patten v. Signator Ins. Ag., Inc.*, 441 F.3d 230, 234 (4th Cir. 2006); *see also Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 n.5 (4th Cir. 1998).

Thus, the Virginia law provides greater or equal protection for arbitration awards than the federal law in that it is more restrictive as to the grounds on which a court may vacate an arbitration award. *See M & L Power Servs., Inc.*, 44 F. Supp. 2d at 141. I also find that there is nothing contained in the VUAA that hinders the enforceability, according to their terms, of private agreements to arbitrate. Therefore, I find that this court must rely upon the VUAA in deciding whether the arbitration award should be vacated.

As Penn Virginia notes in its brief, judicial review of an arbitration award under the VUAA is limited to the specific statutory criteria contained therein. *See SIGNAL Corp. v. Keane Fed. Sys., Inc.*, 574 S.E.2d 253, 256 (Va. 2003) (citing *Trs. of Asbury*

-13-

*United Methodist Church v. Taylor & Parrish, Inc.*, 452 S.E.2d 847, 852 (Va. 1995)). Thus, in order for this court to vacate the arbitration award, it must do so on one of the grounds specifically enumerated in Virginia Code Annotated § 8.01-581.010. The only ground upon which CNX relies that is enumerated in the VUAA is that the Panel exceeded its authority.[2] Specifically, CNX argues that the Panel exceeded its authority by failing to base its decision on applicable case law and by ignoring the plain language of the meaning of the *force majeure* provision of the Lease by rewriting it to require foreseeability and pre-contract due diligence. I find this argument misplaced. In determining whether arbitrators exceeded their authority, the relevant question is not whether their conclusions were legally correct, but whether they had the power to resolve the parties' claims. *See SIGNAL Corp.*, 574 S.E.2d at 256-57. As the court in *SIGNAL Corp.* noted, "[a] contrary conclusion would permit a dissatisfied party, who by agreement voluntarily submitted to arbitration, to invoke the jurisdiction of a . . . court in an effort to relitigate the merits of the controversy already decided by the arbitrators." 574 S.E.2d at 257. I find that the following language contained in Article TWENTY-SEVENTH of the parties' Lease demonstrates that the Panel did not exceed its authority: "[i]f there should arise any matters in dispute hereunder on which Lessor and Lessee cannot finally agree, such matter or matters shall be referred to a board of arbitrators. . . ."

---

[2]Although CNX's counsel stated at the November 30, 2006, hearing that if the VUAA applied, the only ground for vacating the Panel's arbitration award would be clerical error, the Fourth Circuit has unambiguously held that an arbitration award may be vacated only on the grounds enumerated in Virginia Code Annotated § 8.01-581.010. *See SIGNAL Corp.*, 574 S.E.2d at 256. Clerical error is not one of the grounds for vacation listed at Virginia Code Annotated § 8.01-581.010. However, I note that, in any event, CNX does not argue that any sort of clerical error was made in the Panel's arbitration award. CNX's argument that the arbitrators exceeded their authority was made in the context of the FAA. However, since that also is a ground for vacation of an arbitration award under the VUAA, CNX's argument will be construed thereunder.

-14-

I note that CNX's remaining arguments arise under common law under the FAA and are not recognized under the VUAA. That being the case, they will not be discussed in this Report and Recommendation.

For all of these reasons, I recommend that the court deny CNX's Motion to Vacate, (Docket Item No. 7), and enter judgment in favor of Penn Virginia confirming the Panel's award.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. The parties' predecessors-in-interest to this action entered into the Lease agreement in 1997 which contained an agreement to arbitrate any disputes arising from their rights or obligations under the Lease;

2. The enforceability of an arbitration agreement is governed by the FAA if the arbitration agreement is in writing and if the transaction underlying the parties' agreement involves interstate commerce;

3. The Lease is in writing and involves interstate commerce. Thus, the enforceability of the arbitration provision contained in the Lease is governed by the FAA;

4. FAA standards of review cannot preempt state law standards of review for arbitration awards unless the state law standards of review frustrate the underlying objectives of the FAA;

-15-

5.  The VUAA provision relevant to the vacation of an arbitration award does not conflict with the underlying objectives of the FAA;

6.  Thus, the VUAA applies to the issue currently before this court;

7.  Judicial review of an arbitration award under the VUAA is limited to the specific statutory criteria contained therein;

8.  The only ground contained in the VUAA upon which CNX relies to vacate the arbitration award is that the Panel exceeded its authority;

9.  In determining whether arbitrators exceed their authority, the relevant question is not whether the arbitrators' conclusions were legally correct, but whether they had the power to resolve the parties' claim;

10. The language contained in Article TWENTY-SEVENTH of the Lease evidences that the Panel did not exceed its authority; and

11. Thus, the Panel's award should be confirmed.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court deny the Motion to Vacate, (Docket Item No. 7), and enter judgment in favor of Penn Virginia confirming the Panel's award.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C §

636(b)(1)(C):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen M. Williams, Senior United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record.

DATED: February 22, 2007.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-17-

Case 1:06-cv-00090-GMW-PMS   Document 20   Filed 02/22/07   Page 17 of 17   Pageid#: 239